IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANDREW ROSENFELD | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil No. 09-4127 (JBS/KMW) |
| CANON BUSINESS SOLUTIONS, INC., | |
| Defendant. | **OPINION** |

APPEARANCES:

Jeremy M. Cerutti, Esq.
Ari R. Karpf, Esq.
KARPF, KARPF & VIRANT, P.C.
3070 Bristol Pike
Building 2, Suite 231
Bensalem, PA 19020
     -and-
Richard Stevens Swartz, Esq.
SWARTZ LEGAL LLC
1878 Marlton Pike East, Suite 10
Cherry Hill, NJ 08003
     Attorneys for Plaintiff

John M. Nolan, Esq.
JACKSON LEWIS
220 Headquarters Plaza
East Tower, 7th Floor
Morristown, NJ 07960
     Attorney for Defendant


**SIMANDLE**, District Judge:


I.  **INTRODUCTION**

     Plaintiff, Andrew Rosenfeld, brought a claim against

Defendant, Canon Business Solutions (Canon), seeking actual and

punitive damages for allegedly violating his rights under the Family and Medical Leave Act (FMLA) and the New Jersey Law Against Discrimination (LAD).  Presently, both parties are before the court moving for summary judgment.  Plaintiff seeks summary judgment only on his FMLA interference claims while Defendant seeks summary judgment with respect to all of Plaintiff's claims.

Plaintiff's FMLA claims break down into two types, those based on interference with his rights under the FMLA and a claim based on Defendant allegedly retaliating against Plaintiff for invoking his FMLA rights.  With respect to the interference claims, the principal questions are whether Plaintiff suffered from a serious medical condition and whether Plaintiff provided adequate notice to Defendant regarding his serious medical condition.  The primary issues to be decided for the FMLA retaliation claim are whether Plaintiff has adduced sufficient evidence from which a reasonable jury could find Defendant actually relied upon Plaintiff's FMLA leave to terminate him.

With regard to the LAD claims, Plaintiff alleges three violations: (1) failing to accommodate his handicap; (2) retaliating against Plaintiff for requesting an accommodation; and (3) discriminating against Plaintiff because of his health conditions.  Regarding the first alleged violation, the primary issues relate to whether a material factual dispute exists

regarding whether Defendant engaged in a good faith interactive process to accommodate Plaintiff and whether Plaintiff's requested accommodation would have resulted in an undue hardship.  The LAD retaliation claim primarily revolves around the causation element.  The main issues of contention for the third alleged violation are whether there is a material factual dispute about whether Plaintiff is handicapped within the meaning of the LAD and whether Plaintiff is otherwise able to perform his job functions.

The Court heard oral argument July 27, 2011 and now decides all issues presented in these voluminous cross-motions.


## II.  FACTUAL BACKGROUND[1]

Defendant Canon Business Solutions hired Plaintiff, Andrew Rosenfeld, for a Supervisor, Strategic Pricing position on March 19, 2007.  Defendant told Plaintiff at the time of hiring that he would be working the 11:30 a.m. to 8:00 p.m. shift, and Plaintiff responded that it would not be a problem.  No other supervisor in the Strategic Pricing Department worked the late shift.  Part of Plaintiff's duties included reviewing the terms

---

[1] Except when otherwise noted, the following is based on facts admitted by both parties in their respective statements of undisputed material facts and responses to such statements in accordance with L. Civ. R. 56.1 and from undisputed deposition testimony.

and conditions of requests for proposals (RFPs).[2]  Plaintiff was hired into the later shift to provide support to Canon's central and west coast sales agents.  Because RFPs are part of an ongoing negotiation process, they are often time sensitive.

During Plaintiff's training period, which lasted from March to September, 2007, Plaintiff worked the early shift, which began at 8:30 a.m. and ended at 5:00 p.m., that is, three hours earlier than the late shift.

Within the Strategic Pricing department, Plaintiff supervised two people, Anthony Alfaro and Crystal Eleazar and worked alongside Helen Osborne, who held the same title as Plaintiff, although she had slightly different responsibilities.

In early May, 2008, approximately eight months after commencing his late shift, Plaintiff, in person, informed Joseph Pitt, his boss, that he suffered from insomnia.[3]  On May 8, 2008, Plaintiff filled out an "Employee Request for Reasonable Accommodation" form and submitted it to the human resources department.  In the form, Plaintiff requested his shift be

---

[2] An RFP is essentially a proposed sales contract, which specifies a price and Canon's obligations for service.

[3] Plaintiff contends he actually informed Mr. Pitt of his insomnia prior to May, 2008 but Defendant denies this.  All agree, however, that at least by May, 2008, Plaintiff informed Defendant of his illness.  It is also not entirely clear whether he told Joseph Pitt that he suffered from insomnia, sleep apnea or both.

changed to start at 8:30 a.m. and end at 5:00 p.m., like it had during his training period.  He also attached a note from his primary care physician, Dr. Willingmyre, which indicated he suffered from stress and insomnia due to "abnormal" working hours.  Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. F.  Dr. Willingmyre did not mention migraines.  The note recommended Plaintiff's hours be changed to the earlier schedule.  Thus, Plaintiff sought a change of shift to the "early" shift, three hours earlier, as a reasonable accommodation for his insomnia.

On May 14, 2008, Canon asked Plaintiff to sign an authorization form, which would allow Canon to access his medical records.[4]  Plaintiff altered the form, with Defendants' permission, to reflect the fact that Plaintiff only wanted Canon to have access to his medical records and be able to speak to Dr. Willingmyre insofar as it related to his request for a reasonable accommodation.

Sometime after May 8, 2008, Barbara Langevine, Human Resources Director, requested Plaintiff undergo a sleep study.[5] Plaintiff met with Dr. Nugent, the sleep specialist, on July 30, 2008 for an initial evaluation.  Plaintiff scheduled the sleep

---

[4] It is not clear exactly who from Canon made this request, but the request was made because Plaintiff submitted a reasonable accommodation form. See Pl.'s Dep., 150:22-25, 151:1-7.

[5] Some of the court documents and record evidence refer to Barbara Langevine by her prior last name, Telesford.

study for Labor Day weekend and, after two postponements, on September 21, Plaintiff underwent the sleep study.

Dr. Nugent compiled the results of the study on September 21. Barbara Langevine received a copy of the sleep study results, but it is not exactly clear when.  Dr. Nugent sent a letter, dated October 16, 2008, to Dr. Willingmyre and Barbara Langevine describing the results of the sleep study.  It is also not clear exactly when Barbara Langevine received this letter. The results showed that Plaintiff did not suffer from sleep apnea but did suffer from insomnia.[6]  There is no evidence that Langevine or any other Canon employee contacted Dr. Willingmyre or Dr. Nugent for additional information or clarification about Plaintiff's conditions.

Plaintiff started to look for open positions in other parts of the company via the company intranet beginning in August or September, 2008.  About this same time Canon entered a hiring freeze due to overall economic conditions.

Plaintiff spoke with Barbara Langevine by phone on multiple occasions, with most of these phone calls happening sometime before January 23, 2009.  On these phone calls, Plaintiff would ask if there had been any developments regarding his reasonable accommodation request.  Dep. of Barbara Langevine, 113:4-8.  She

---

[6] In some of Plaintiff's motions, Plaintiff continues to maintain that he suffers from sleep apnea despite this evidence to the contrary.

informed him that they had not found anything yet but that they would keep looking.  Id.  On at least one of these phone calls Barbara Langevine told Plaintiff that no supervisory positions were available at the Burlington office.  Id. at 114:14-18. However, according to Barbara Langevine, on some of these phone calls, she offered Plaintiff an Analyst position in the Burlington office with the regular hours of 8:30 a.m. to 5:00 p.m.  Dep. of Barbara Langevine, 115:2-13.  Barbara Langevine believed Plaintiff rejected all of these offers.  Id.

On January 23, 2009, Plaintiff spoke again with Barbara Langevine by phone about his reasonable accommodation request. She apparently again asked if Plaintiff would be interested in an Analyst position at the Burlington office.  Id. at 114:7-10. According to Barbara Langevine, Plaintiff "was adamant that he did not want it."  Id. at 114:10.

Plaintiff, while acknowledging that an Analyst position was discussed, does not believe he was ever actually offered the position.  Pl.'s Dep. at 263:3-9.  Rather, he believes Defendant was simply asking him a hypothetical question of whether he would consider an Analyst position to be a demotion.  Id. at 263:9-10.  He responded that he felt it would be a demotion, but, according to Plaintiff, he never rejected the offer, since, he believes, the offer was never made.  Id. at 264:1-2.

7

On March 27, 2009, Plaintiff sent an e-mail to Nelson Remetz, Vice President of Human Resources, inquiring about the status of his request for accommodation. Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. FF (E-mail from Plaintiff to Nelson Remetz, 3/27/09). Plaintiff never received a response to this e-mail. Pl.'s Dep., 171:10-11. Plaintiff had also previously spoken with Nelson Remetz (in addition to Barbara Langevine) about his request for accommodation. Dep. of Barbara Langevine, 134:1-4.

At some point in March, 2009, Joseph Pitt, Nelson Remetz and Juanita Nash-Dahlen, Director Employee Relations, decided to terminate Plaintiff. Dep. of Juanita Nash-Dahlen, 33:7-15. According to Juanita Nash-Dahlen: "[H]e was given an opportunity to take a position in Lake Success, which would have the hours he was looking for and the supervisory level. If Mr. Rosenfeld declined that offer, then we were prepared to separate him. That was in March of '09. However, subsequent to all of that is when we then learned about the doctor's note and so on and so the decision was made then to term[inate]." Dep. of Juanita Nash-Dahlen, 32:10-18. The Lake Success position and "doctor's note" are discussed below.

Plaintiff was not offered the position in Lake Success until April 16, 2009. Dep. of Robin Rutter, 34:7. Plaintiff

initially declined the position but then decided to talk it over with his wife.  Id. at 35:9-12.

Another crucial fact to the dispute involves Plaintiff's false report of seeing a doctor on one occasion.  On April 13, 2009, Plaintiff sent an e-mail to Mr. Pitt, which said he had visited a doctor's office and that the doctor had told him he should rest.  What actually occurred is unclear, but the record is clear that Plaintiff did not see a doctor that day.  He subsequently spoke with Robin Rutter, Human Resources Manager, about this absence, and she asked him to produce a doctor's note.  He explained that he could not produce one because he had seen his mother, who is a nurse practitioner.  Pl.'s Dep., 338:23-25, 339:1-2.  However, he never explicitly told Robin Rutter that he had misstated himself in his e-mail to Joseph Pitt.  Pl.'s Dep., 340:1-4.  Furthermore, Fran Rosenfeld, Plaintiff's mother and nurse practitioner, stated in her deposition that she could not have seen her son at her house on the morning of April 13, 2009, because it was a work day, and "I don't have people at my house before I go to work at 7:30 in the morning."  Dep. of Fran Rosenfeld, 44:2-5.  There is no dispute that he misrepresented to Canon that he saw a doctor when, at most, he saw his mother who is a nurse, and that she even denies seeing him or advising him to stay home.  He did not own up to this falsehood until he was unable to produce a doctor's note.

9

From April 20 through April 23, 2009, Plaintiff was out sick.  On April 21 Plaintiff sent an e-mail to Joseph Pitt explaining he would not be at work due to a migraine.  Joseph Pitt replied via e-mail.  In this e-mail, Joseph Pitt told Plaintiff: "I was informed by our HR department that due to your extended absences you will need to contact TOPS."  Pl.'s Mot. for Summ. J., Ex. R (E-mail from Joseph Pitt to Plaintiff dated 4/21/09).  In the e-mail, Joseph Pitt also provided the contact information for TOPS.

TOPS was Defendant's third-party FMLA administrator. Requests for FMLA leave would be forwarded to TOPS, and then TOPS would decide whether to grant FMLA leave.  By Plaintiff's own admission, Defendant had no say in deciding who would or would not receive FMLA leave.  Pl.'s Dep., 114:9-10.

Plaintiff contacted TOPS on April 21 and requested intermittent leave under the FMLA.  Pl.'s Mot. for Summ. J., Ex. S (TOPS e-mail dated 4/21/09).  Robin Rutter received an automatic e-mail generated by TOPS on April 21, which informed her of this development.  Id.

On April 23, Plaintiff sent an e-mail to Mr. Pitt telling him he needed to use an FMLA day.  Plaintiff thereafter obtained a doctor's note dated April 24, 2009 from Deborah L. Horowitz, M.D., stating: "Please excuse 4/20 — 4/24/09.  Dx: sinusitis/migraine headaches."  Pl.'s Mot. for Summ. J., Ex. O.

On April 27, Plaintiff returned to work.  On that same day, Plaintiff was again offered the supervisory position in Lake Success, NY.  When Plaintiff declined, he was terminated.  He was told that he was being terminated for falsifying company records, but Defendant admitted that he was fired in part for attendance issues beginning in 2007.  Dep. of Joseph Pitt, 124:9-14.  Plaintiff was not told that he was being fired for seeking FMLA leave.  On April 28, the day after Plaintiff was fired, TOPS approved Plaintiff for FMLA leave beginning on April 7, 2009 and lasting until April 6, 2010.  In other words, TOPS determined Plaintiff was FMLA-eligible as of April 7, 2009, twenty days before Canon fired him.

Plaintiff received performance reviews for 2007 and 2008. In his 2007 performance review, Plaintiff fully met requirements in six categories and met some requirements in nine categories. Def.'s Mot. for Summ. J., Ex. M (2007 Exempt Employee Performance Evaluation).  Notably, Plaintiff exceeded his allotted sick days in 2007; even on the early shift during his training period, he had attendance issues.  Plaintiff told Joseph Pitt that he planned to work on his attendance issues going forward.  For 2008, Plaintiff fully met requirements in five categories, met some requirements in nine categories and did not meet requirements in one category,

"Attendance/Punctuality."  Def.'s Mot. for Summ. J., Ex. S (2008 Exempt Employee Performance Evaluation).

For 2008 Plaintiff was allowed six sick days.  Def.'s Mot. for Summ. J., Ex. T (2008 Planner).  He used thirteen.  Id.  For one of the sick days, July 21, 2008, Joseph Pitt noted in the attendance planner that Plaintiff went home sick due to an ocular migraine.  Id.  For 2009, Plaintiff was allowed seven sick days and used thirteen.  Def.'s Mot. for Summ. J., Ex. V (2009 Planner).  Six of these sick days occurred after April 7, when TOPS retroactively (and after Plaintiff was fired) granted Plaintiff FMLA leave.

### III. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Summary judgment will not be denied based on mere allegations or denials in the pleadings; instead, some evidence must be produced to support a material fact.  Fed. R. Civ. P. 56(c)(1)(A); United States v. Premises Known as 717 S. Woodward Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993).  However, the Court will

view any evidence in favor of the nonmoving party and extend any reasonable favorable inferences to be drawn from that evidence to that party.  Hunt v. Cromartie, 526 U.S. 541, 552 (1999). Where the nonmoving party bears the burden of persuasion at trial, the moving party may be entitled to summary judgment merely by showing that there is an absence of evidence to support an essential element of the nonmoving party's case. Fed. R. Siv. P. 56(c)(1)(B); Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Where both parties have brought motions for summary judgment, as in the present case only with respect to Plaintiff's FMLA interference claims, the analysis remains the same. "The burdens of proof do not change in cases where a court is considering cross-motions for summary judgment.  On cross-motions for summary judgment, the court must construe the motions independently, viewing the evidence presented by each moving party in the light most favorable to the nonmovant." Selective Way Ins. v. Travelers Property Cas. Co. of America, 724 F. Supp. 2d 520, 525 (E.D. Pa. 2010) (internal citations omitted).  Lastly, just because both parties have moved for summary judgment does not mean that one or the other must be granted; both may be denied.  Manetas v. Int'l Petroleum Carriers, Inc., 541 F.2d 408, 413 (3d Cir. 1976).

**IV.  DISCUSSION**

    **A.  FMLA Claims**

    The FMLA was passed by Congress in 1993 to "balance the demands of the workplace with the needs of families."  29 U.S.C. § 2601(b)(1).  The FMLA grants eligible employees who work for employers covered by the FMLA the right to take off twelve workweeks of leave during any twelve-month period because of, among other reasons, "a serious health condition that makes the employee unable to perform the functions of the position of such employee."[7]  29 U.S.C. § 2612(a)(1)(D).

    Courts have understood claims brought under the FMLA to fall into two separate categories, usually referred to as interference claims and retaliation claims.  <u>Parker v. Hahnemann University Hosp.</u>, 234 F. Supp. 2d 478, 483 (D.N.J. 2002).  An interference claim derives from 29 U.S.C. § 2615(a)(1), which makes it "unlawful for any employer to interfere with, restrain, or deny the exercise or the attempt to exercise, any right provided under this subchapter."  A retaliation claim is based on 29 U.S.C. § 2615(a)(2), which makes it "unlawful for any employer to discharge or in any other manner discriminate

---

[7] <u>See</u> 29 U.S.C. § 2611(4)(A) and 29 C.F.R. § 825.104(a) for a description of what employers are covered by the FMLA and 29 U.S.C. § 2611(2)(A) and 29 C.F.R § 825.110(a) for a description of who qualifies as an "eligible employee."  <u>See</u> 29 U.S.C. § 2611(11)(B) and 29 C.F.R. § 825.115(a) & (c) for a description of what constitutes a "serious health condition."

against any individual for opposing any practice made unlawful by this subchapter." Interference and retaliation claims are evaluated differently, and each will be discussed in turn.

Plaintiff has asserted that Defendant violated the FMLA in six different ways: (1) by not offering Mr. Rosenfeld FMLA leave related to his migraines and insomnia; (2) by failing to provide individualized notification to Plaintiff of his FMLA rights; (3) by not referring Plaintiff to human resources or TOPS, Defendant's third-party FMLA leave administrator prior to April, 2009; (4) by not designating any of Plaintiff's absences as FMLA-qualifying prior to April, 2009; (5) by discouraging Plaintiff from taking FMLA leave; and (6) by considering FMLA-qualifying absences in its decision to terminate Plaintiff. Pl.'s Mot. for Summ. J. 11.[8]

Plaintiff's first five claims above are interference claims. Plaintiff addresses his sixth argument as if it were an interference claim, and Defendant responds to it as if it were an interference claim. But Defendant, in its own motion for summary judgment, also argues against any potential retaliation

---

[8] Plaintiff argues for the first time in his motion for summary judgment that Defendant violated the FMLA in a seventh way as well, by requiring him to work from home when he was out sick. Pl.'s Mot. for Summ. J. 11. However, Plaintiff failed to allege any facts relating to this allegation in his Complaint. Therefore, Plaintiff cannot raise this claim for the first time now in his brief.

claims Plaintiff may have.  Despite the apparent confusion among the parties, Plaintiff's sixth ground is a retaliation claim.[9]

### 1.    Interference Claims

To establish an interference claim, "the employee only needs to show she was entitled to benefits under the FMLA and that she was denied them." Parker, 234 F. Supp. 2d at 485.  See also Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005).  The issue in an interference claim is not discrimination but interference with an entitlement, so a FMLA plaintiff is not required to prove intentional misconduct. Calliston, 430 F.3d at 119; Williams v. Shenango, Inc., 986 F. Supp. 309, 317 (W.D. Pa. 1997).

Courts apply a five-factor test to determine whether an employee was entitled to benefits under the FMLA that were then denied: "(1) he was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the employer of his intention to take FMLA leave;

---

[9]   The Third Circuit has recognized that some employer conduct can constitute both interference and retaliation; for example, "firing an employee for [making] a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009).  Where, as in the present case, the plaintiff claims he was terminated for taking FMLA-protected leave, the claim is analyzed as retaliation, because the employee has received the leave to which he was entitled under FMLA.

and (5) the plaintiff was denied benefits to which he was entitled under the FMLA." Atchison v. Sears, 666 F. Supp. 2d 477, 488 (E.D. Pa. 2009). The first two factors are not at issue in the present case.[10] The third factor – Plaintiff's entitlement – hinges upon the existence of a "serious health condition" as discussed next. The fifth element hinges on the fourth because if Plaintiff did provide proper notice, then Defendant clearly denied him FMLA benefits from the point of such notice going forward.

### i. Entitlement to FMLA Leave: Serious Health Condition

In the present case, entitlement to FMLA leave depends upon Plaintiff's demonstration that he had a "serious health condition" during the relevant period. FMLA provides that an eligible employee shall be entitled to up to twelve workweeks of leave during any twelve-month period for several reasons, including "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" means "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing

---

[10] Defendant, for the purposes of this law suit, admits that it is a covered employer and that Andrew Rosenfeld is a covered employee. See Def.'s Mem. of Law in Opp'n To Pl. Andrew Rosenfeld's Mot. for Summ. J. 7 n.5.

treatment by a health care provider." 29 U.S.C. § 2611(11).
The concept of "serious health condition" is to be construed
broadly, so that the FMLA's provisions are interpreted to effect
the Act's remedial purpose. Stekloff v. St. John's Mercy Health
Systems, 218 F.3d 858, 862 (8th Cir. 2000).

The phrase "serious medical condition" is defined in
regulations at 29 C.F.R. § 825.113. A seemingly minor
condition, such as a peptic ulcer, can rise to the level of a
"serious health condition" if it meets the regulatory criteria,
Victorelli v. Shadyside Hosp., 128 F.3d 184, 190 (3d Cir. 1997),
because FMLA is "intended to protect those who are occasionally
incapacitated by an ongoing medical problem." Id.

In the present case, Mr. Rosenfeld alleges that he
suffered from chronic serious health conditions of insomnia,
sleep apnea and migraine headaches. The regulatory requirement
for a chronic serious health condition appears in 29 C.F.R. §
825.115(c), which provides:

> (c) Chronic conditions. Any period of
> incapacity or treatment for such incapacity
> due to a chronic serious health condition.
> A chronic serious health condition is one
> which:
>> (1) requires periodic visits (defined
>> as at least twice a year) for treatment
>> by a health care provider, or by a
>> nurse under direct supervision of a
>> health care provider;
>> (2) continues over an extended period
>> of time (including recurring episodes
>> of a single underlying condition); and

18

> (3) may cause episodic rather than a
> continuing period of incapacity (e.g.,
> asthma, diabetes, epilepsy, etc.).

The FMLA regulations, requiring examination of the nature and severity of the impairment, its expected duration, and its anticipated long-term impact, must guide courts' application of the definition of serious health condition.  Navarro v. Pfizer Corp., 261 F.3d 90 (1st Cir. 2001).

There appears to be no dispute that Plaintiff suffers from insomnia.  Dr. Willingmyre's note in May, 2008, indicated she was treating him for insomnia due to his working the later shift.  Dr. Nugent's sleep study confirmed insomnia by October, 2008, but it ruled out sleep apnea[11], as discussed above.

Whether Plaintiff's insomnia was sufficiently severe and chronic under 29 C.F.R. § 825.115(c), supra, rests upon disputed issues of fact.  Plaintiff's insomnia, which Dr. Willingmyre linked to his change in work shifts, began before May, 2008,

---

[11] Under certain conditions, sleep apnea that is sufficiently severe, chronic and the subject of continuing medical treatment can qualify as a serious health condition.  Peter v. Lincoln Technical Institute, Inc., 255 F. Supp. 2d 417 (E.D. Pa. 2002). In the present case, however, Plaintiff has presented no such evidence of sleep apnea, and Defendant is entitled to partial summary judgment that Plaintiff did not have sleep apnea as a serious health condition.  Dr. Willingmyre's mention of sleep apnea in her May, 2008, note is insufficient because it was not the result of a recognized test or other diagnostic procedure and she rendered no medical treatment for this condition.  Dr. Willingmyre's entertaining of sleep apnea as a diagnosis would seem to be ruled out by the results of the actual diagnostic tests subsequently performed in September, 2008, by Dr. Nugent.

when Plaintiff disclosed his condition to his employer as a basis for his missing work.  While it is clear that Plaintiff had the benefit of Dr. Nugent's evaluation in the sleep study, it is unclear what ongoing medical treatment he received for insomnia and whether these treatments complied with the requirement of § 825.115(c)(1) for periodic visits (at least twice per year) to a health care provider.  It would appear that there were recurring episodes of insomnia documented over time, as required by § 825.115(c)(2).  Additionally, it is unclear whether episodes of insomnia caused periods of incapacity, under § 825.115(c)(3).  While a fair reading of the record of medical treatment and Plaintiff's testimony may permit a reasonable factfinder to agree that Plaintiff suffered from a chronic serious health condition, the facts upon the present record do not require such a finding.

Plaintiff's evidence for migraine headaches as a serious health condition is even less compelling.  "Ocular migraine" is mentioned in the one attendance planner entry and in several conversations with supervisors on unknown dates.  For instance, according to Joseph Pitt's deposition testimony, "[Andrew Rosenfeld] would often leave messages that he was out because of an ocular migraine."  Pitt Dep. 59:10-11.  Plaintiff's self-diagnosis is unaccompanied by records of medical treatment for these migraines.  Defendant disputes whether Plaintiff's

occasional migraine headaches, if assumed to be true, rose to the level of a chronic, serious medical condition.  Ordinarily, "headaches other than migraine" do not qualify for FMLA leave, 29 C.F.R. § 825.113(d), which suggests that migraines, if chronic, debilitating, and medically treated with frequency, can qualify as a serious health condition in an appropriate case. According to Dr. Willingmyre, there is medical evidence that Plaintiff has been diagnosed and treated for migraine headaches in the past, see Willingmyre Dep. 42:4-6, 11-14, but there does not seem to be a medical record of treatment of migraines during the period in question here.  Dr. Willingmyre's May, 2008, note to Defendant did not mention migraines, nor are migraines identified in Dr. Nugent's sleep study.  Upon this record, a factfinder could find, at least, that Mr. Rosenfeld experienced occasional headaches which he labeled as "migraines" but for which he received no medical treatment from a medical provider during the time in question.  Accordingly, he will be unable to prove that his headaches constituted a serious health condition within the meaning of 29 C.F.R. § 825.115, and Defendant is entitled to partial summary judgment that Plaintiff's headaches do not constitute a serious health condition.

### ii.  Employee Notice

The Department of Labor regulations accompanying the FMLA provide initial guidance as to what constitutes appropriate notice.  They state: "An employee shall provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request."  29 C.F.R. § 825.303(b).  Significantly, "[w]hen an employee seeks leave for the first time for a FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA."  Id.  However, "[c]alling in 'sick' without providing more information will not be considered sufficient notice[.]"  Id.  If "the employer does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further of the employee . . . to ascertain whether leave is potentially FMLA-qualifying."  29 C.F.R. § 825.301(b).  That is, if the employer is unsure why an employee has taken leave, the employer has an affirmative duty to find out if the leave is FMLA-qualifying.

As the Third Circuit has elaborated, "[i]n providing notice, the employee need not use any magic words."  Sarnowski v. Air Brooke Limousine Inc., 510 F.3d 398, 402 (3d Cir. 2007).  Rather, "[t]he critical question is how the information conveyed to the employer is reasonably interpreted.  An employee who does not cite to the FMLA or provide the exact dates or duration of

the leave requested nonetheless may have provided his employer with reasonably adequate information" for the employer to understand that FMLA leave was being requested.  Id.

Plaintiff contends that he provided adequate notice to Defendant of his serious health conditions (migraines and insomnia).  Regarding migraines, the extent of notice given by Plaintiff to Defendant is immaterial, because as found above, Plaintiff's occasional headaches do not qualify as a serious health condition.

Defendant also argues that Plaintiff never indicated whether any of his absences were related to his insomnia.  This is true, but Plaintiff still provided adequate notice: Plaintiff requested a reasonable accommodation due to his insomnia and provided a doctor's note confirming this diagnosis; Defendant requested Plaintiff undergo a sleep study; Plaintiff did and Defendant received the results, on or about October 17, 2008 confirming the diagnosis of insomnia.  By that point, at the very latest, a reasonable factfinder could find that Defendant should have referred Plaintiff to TOPS.

Additionally, Defendant points out that Plaintiff exceeded his sick leave in 2007, before he qualified for FMLA leave and that many of Plaintiff's absences occurred on Mondays.  To the extent that Plaintiff asserts that his absenteeism was related to insomnia caused by his late shift work schedule, his absences

in 2007 — while working the early shift — raise a material factual dispute.  If, as Plaintiff alleges, his excessive absences were related to insomnia, that condition, which was not documented until May 2008 in Plaintiff's notice and doctor's note, would not explain his frequent absences while working the early shift in 2007.  There is no evidence in this record that Plaintiff gave notice regarding insomnia before May 2008, and insomnia is ruled out as a basis of FMLA recovery before May 2008 for lack of notice.  Defendant's motion for summary judgment will be granted in part to dismiss Plaintiff's FMLA claims regarding insomnia prior to May 2008, for lack of notice. Accordingly, Plaintiff's summary judgment motion upon his FMLA interference claims related to insomnia is denied in part with respect to insomnia before May 2008, and Defendant's motion will be granted in part as to Plaintiff's FMLA claims relating to insomnia before May, 2008.

Whether insomnia, post-May 2008, contributed to his heightened attendance problems, cannot readily be assumed upon this record. It may require expert testimony to explain how insomnia works and how it particularly affected Plaintiff's job performance in the 2008-2009 time frame leading to his termination.  In other words, there is a disputed issue of material fact whether, in the post-May 2008 period, insomnia contributed to Plaintiff's absences from work, and the parties'

24

FMLA cross-motions will be denied with respect to the post-May 2008 period as related to insomnia.

### iii. Denial of Employee Benefits

In addition to proving notice, to state a valid claim an employee must also demonstrate that the employer has actually interfered with his rights under the FMLA (prong 5).  If Plaintiff provided sufficient notice of a "serious health condition", then Defendant was obligated under the FMLA to (1) offer Plaintiff FMLA leave; (2) provide individualized notice about his FMLA rights; (3) refer Plaintiff to human resources or TOPS; (4) designate qualifying leave as FMLA leave; and (5) not discourage Plaintiff from taking FMLA leave.  The earliest date on which Plaintiff arguably provided notice of a serious health condition, namely insomnia, was May 2008.  Defendant never offered Plaintiff FMLA leave, referred Plaintiff to human resources or TOPS or designated qualifying leave as FMLA leave until April, 2009.  TOPS found Plaintiff FMLA eligible as of April 7, 2009, as noted above.

The Department of Labor implemented a number of specific requirements regarding notice. These requirements can be thought to fall into two categories: general notice requirements and individual notice requirements.

*Defendant's Lack of General Notice.*  Regarding general notice, employers must post in a conspicuous place a notice

explaining the FMLA.  29 C.F.R. § 825.300(a)(1).  Additionally, employers must provide a general notice about employees' FMLA rights either as part of a company handbook, separately or electronically.  29 C.F.R. § 825.300(a)(3).  Plaintiff admitted Canon complied with the poster requirement and admitted to having signed a form indicating he received a company handbook that includes a provision on employee FMLA rights.  However, Plaintiff averred that he never actually received the handbook.  Regardless, Plaintiff conceded that he could have accessed the FMLA provisions via the company intranet but never did so.  Consequently, there is no genuine issue as to whether Defendant complied with these general notice requirements.  It did.  Plaintiff's allegation that Defendant failed to provide him proper FMLA notice must fail for lack of such evidence, and Defendant will be granted partial summary judgment dismissing Plaintiff's claim of general lack of notice of FMLA rights.

   *Defendant's Lack of Individual Notice.*  The regulations also require an employer to "notify the employee of the employee's eligibility to take FMLA leave within five business days" of ascertaining that his leave may be for an FMLA-qualifying reason.  29 C.F.R. § 825.300(b)(1).  This individualized notice must be in writing.  29 C.F.R. § 825.300(c)(1).  Plaintiff contends he never received this individualized notice prior to April, 2009.  Defendant agrees

but counters that since Plaintiff himself did not provide proper
notice of a "serious health condition" to Defendant, it was
under no obligation to notify Plaintiff of his eligibility to
take FMLA leave.  Defendant's argument is a correct statement of
the law.  However, Plaintiff did provide proper notice, at least
as it related to his insomnia, for which he sought
accommodation, perhaps as early as May 2008.  See discussion
supra.  It remains to be determined whether Plaintiff's insomnia
was a "serious health condition" of which Plaintiff gave proper
notice in or after May 2008, triggering defendant's duty to
advise him of FMLA rights before April 2009.

   *Discouragement of FMLA Leave.*  With respect to Plaintiff's
fifth claim, Plaintiff argues that Defendant discouraged him
from taking FMLA leave by criticizing him for his attendance
record and exhibiting frustration toward him about his
attendance.  According to Anthony Alfaro, one of Plaintiff's
supervisees, "Joe Pitt definitely expressed frustration [at
Plaintiff's absences]."  Dep. of Anthony Alfaro, 32:14-21.
Plaintiff also alleges that sometimes, when he would report in
sick to Joseph Pitt, Mr. Pitt would say things like, "You're
kidding me.  You're missing work again?" and, "You're really
going to be out again today."  Pl.'s Dep., 167:11-16.  Even if
these statements constituted discouragement under the FMLA,

there would still be a genuine issue of material fact as to whether Plaintiff was actually discouraged by these statements.

If, when Joseph Pitt allegedly made these statements to Plaintiff, Plaintiff had informed him that the reason for his absence was due to sickness, then such statements would likely constitute discouragement.  In Williams v. Shenango, Inc., 986 F.Supp. 309, 313 (W.D.Pa. 1997), the defendant denied the plaintiff's request for one week of FMLA leave.  Id.  The plaintiff took the leave anyway.  Id.  The defendant initially classified the leave as unauthorized but later reversed when it learned that the leave qualified under the FMLA.  Id.  The Court in Williams still found that Shenango had violated the FMLA because "its initial response to Williams' request may have 'chilled' or otherwise discouraged Williams' assertion of FMLA rights."  Id. at 321.  In this case, although Joseph Pitt at this point apparently did not realize Plaintiff's leave may have qualified under the FMLA, his comments may nevertheless have discouraged Plaintiff from taking additional FMLA-qualifying sick leave in the future.  The issue remains for the jury to decide with respect to whether Defendant discouraged Plaintiff from taking FMLA leave for the condition of insomnia after May, 2008 (assuming Plaintiff succeeds in demonstrating that his insomnia was a "serious health condition").

2.    **FMLA Retaliation Claim**

Retaliation claims are analyzed according to the burden shifting framework outlined in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), if Plaintiff adduces direct evidence of Defendant's discrimination, or McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), if Plaintiff comes forward with indirect evidence of discrimination.  Hicks v. Tech Indus., 512 F. Supp. 2d 338, 357 (W.D.Pa. 2007).  In this case, Price Waterhouse is appropriate since there is direct evidence, in the form of deposition testimony, that Defendant considered FMLA leave in its decision to terminate.

Under Price Waterhouse, if a Plaintiff submits direct evidence that Defendant's FMLA leave was a "substantial factor in the decision to fire him, the burden of persuasion on the issue of causation shifts, and the employer must prove that it would have fired the plaintiff even if it had not considered" Plaintiff's FMLA leave.  Conoshenti v. Public Service Electric & Gas Co., 364 F.3d 135, 147 (3d Cir. 2004).  Plaintiff "must show that the employer actually relied on [his FMLA leave] in making its decision." Price Waterhouse v. Hopkins, 490 at 251.  With respect to the employer's burden,

> in most cases, the employer should be able to
> present some objective evidence as to its
> probable decision in the absence of an
> impermissible motive. . . . An employer may not,
> . . ., prevail. . . . by offering a legitimate

and sufficient reason for its decision if that reason did not motivate it at the time of the decision. Finally, an employer may not meet its burden in such a case by merely showing that at the time of the decision it was motivated only in part by a legitimate reason. . . . The employer . . . must show that its legitimate reason, standing alone, would have induced it to make the same decision.

Id. at 252.  The employer must "make this showing by a preponderance of the evidence." Id. at 253.

### i.   FMLA Leave was a Substantial Factor in the Decision to Terminate

Although Defendant argued for dismissal of Plaintiff's retaliation claim under a McDonnell Douglas framework, the Court will analyze Defendant's arguments under Price Waterhouse, since that is the framework which should be applied.

Direct evidence exists that Plaintiff's potentially FMLA qualifying leave was at least part of the reason Defendant terminated Plaintiff.  In his deposition, Joseph Pitt stated that "performance, attendance, [and] falsifying documents" were the reasons Plaintiff was fired.  Dep. of Joseph Pitt, 117:2-3. Joseph Pitt further admitted that the absences for which Plaintiff was fired included absences up until the day he was let go.  Id. at 124:12-14.  Robin Rutter also stated that Rosenfeld was fired for "performance issues, attendance and finally some type of falsification of documents." Dep. of Robin Rutter, 58:23-24, 59:1.  Juanita Nash-Dahlen agrees that

Plaintiff was terminated in part for his attendance issues. Dep. of Juanita Nash-Dahlen, 36:21. Thus, sufficient evidence exists on this point to overcome Defendant's summary judgment motion.

### ii.   Would Defendant have Terminated Plaintiff Regardless?

Since Plaintiff has provided sufficient direct evidence from which a reasonable jury could conclude that Defendant impermissibly took into account Plaintiff's potentially FMLA-qualifying absences, Defendant bears the burden at trial of proving by a preponderance of the evidence that it would have fired Plaintiff anyway.

A jury could reasonably find that Defendant did have legitimate business reasons for terminating Plaintiff, namely his lackluster performance and falsifying company records. However, a reasonable jury could also find that Defendant would not have fired Plaintiff had it not also taken into account the FMLA-protected aspects of his attendance record. A jury could find that it was inconsistent or improbable for Canon to give poor performance as a reason for termination when Canon offered him a transfer to the supervisory position at Lake Success, NY, which may be regarded as confirmation of satisfactory performance. Also, in documents submitted in connection with Plaintiff's New Jersey unemployment benefits, Defendant claimed

that poor work performance was <u>not</u> a reason for Plaintiff's separation from the company.  Pl.'s Mot. for Summ. J., Ex. V. Similarly, while a reasonable fact finder might determine that Rosenfeld's false statement to his supervisor that he had visited his doctor who advised him to stay home was the sole reason for termination, the circumstances do not compel such a conclusion; there is also admissible evidence that Rosenfeld's absences, including a perhaps significant number of FMLA-protected absences, were an important motivation in Canon's decision to terminate him.  There are material factual disputes that must be left for the jury's resolution at trial; Defendant's motion for summary judgment upon Plaintiff's FMLA retaliation claim must therefore be denied.

**B.  NJ LAD Claims**

Plaintiff alleges Defendant violated the LAD by (1) failing to accommodate his handicap; (2) retaliating against Plaintiff for requesting an accommodation; and (3) discriminating against him for his health condition.  Defendant seeks summary judgment as to all three of these claims while Plaintiff does not seek summary judgment on any of them.  As such, any evidence will be viewed in favor of Plaintiff, the nonmoving party opposing summary judgment.

32

1.   **Is Plaintiff handicapped within the meaning of the LAD**

As a preliminary matter, this Court must first determine whether Plaintiff's migraines and/or insomnia qualify as handicaps within the meaning of the LAD. The LAD defines a handicap or disability as a

> physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness . . . or any mental, psychological or developmental disability . . . resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques.

N.J.S.A. 10:5-5(q).  Under the LAD, disabilities are categorized as either physical or non-physical.  Viscik v. Fowler Equipment Co., 173 N.J. 1, 15 (N.J. Sup. Ct. 2002).  There are distinct requirements for proving a physical disability as compared to a non-physical one.  Id.

For a physical handicap, "a plaintiff must prove that he or she is (1) suffering from physical disability, infirmity, malformation or disfigurement (2) which is caused by bodily injury, birth defect or illness including epilepsy."  Id.  For a non-physical handicap, "a plaintiff must prove that he or she is suffering (1) from any mental, psychological or developmental disability (2) resulting from an anatomical, psychological, physiological or neurological condition that either (a) prevents

33

the normal exercise of any bodily or mental functions or (b) is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques." Id. at *16.

There is evidence in the record from which a factfinder could find that Plaintiff suffers from migraines and insomnia. Migraines can be a physical disability under the LAD. Tynan, 798 A.2d at 656. There does not appear to be any case law on the classification of insomnia specifically under the LAD.

Defendant, without saying more, argues that Plaintiff "has not submitted any independent medical evidence to suggest that his alleged insomnia or migraines rose to the level of a handicap under the LAD." Mem. Of Law in Sup. of Def. Canon Business Solutions, Inc.'s Mot. for Summ. J. 25. However, Defendant received the results of Plaintiff's polysomnography study, which was conducted at Defendant's request. This report confirmed that Plaintiff suffered from insomnia. Plaintiff also submitted a doctor's note which confirmed that he had suffered from migraines. Pl.'s Mot. for Summ. J., Ex. O (Doctor's note dated 4/24/09).

Given that the LAD is supposed to be interpreted liberally, it is conceivable a jury could find that both migraines and insomnia rendered Plaintiff handicapped within the expansive

meaning of the LAD.[12]  Thus, migraines and insomnia remain in play as a potential handicap under the LAD.

### 2.  Failure to Accommodate

To state a valid prima facie case for a failure to accommodate claim under the LAD, there must be proof that "(1) the plaintiff had a LAD handicap; (2) was qualified to perform the essential functions of the job, with or without accommodation; and (3) suffered an adverse employment action because of the handicap." Bosshard v. Hackensack University Medical Center, 783 A.2d 731, 739 (N.J. Super. Ct. App. Div. 2001) (citations omitted).  As a preliminary matter, the employee must make a reasonable accommodation request.  Requests for reasonable accommodation may be oral or written and do not have to be made explicitly.  Boyce v. Lucent Technologies, No. L-5047-01, 2007 WL 1774267, at *5 (N.J. Super. Ct. App. Div. June 21, 2007).

Once an employee requests a reasonable accommodation, "the employer is obliged to engage in an interactive process to attempt to fashion an appropriate reasonable accommodation." Id. (internal quotations and citations omitted).

If "the employee makes a facial showing of discrimination, the burden is placed on the employer to demonstrate that a

---

[12] Defendant points to inapplicable Seventh Circuit case law that sets out a much higher standard for establishing a handicap than the LAD.

reasonable accommodation cannot be provided." Boyce, WL 1774267 at *5. If the proposed "reasonable accommodation" would impose an undue hardship on the employer, then the employer does not have to accommodate the employee. Id. at *4.

Defendant argues that (i) Plaintiff's requested accommodation would have resulted in an undue hardship; (ii) Defendant engaged in an interactive process with Plaintiff; (iii) Plaintiff was at fault for the alleged breakdown of the interactive process; and (iv) Plaintiff failed to identify the existence of a reasonable accommodation.

### i.   Undue Hardship

Whether a proposed reasonable accommodation would impose an undue hardship on the employer "is made on a case-by-case basis, involving a consideration of factors including size of the employer's business, the type of operations, the nature and cost of accommodations needed and the extent to which the accommodation would involve waiver of an essential requirement of a job." Dicino v. Aetna U.S. Healthcare, No. 01-3206, 2003 WL 21501818, at *14 (D.N.J. June 23, 2003).

Defendant insists that moving Plaintiff to the earlier shift would cause an undue hardship because there were no positions vacant and there would be nobody to support its central and west coast operations, which is an important function of the late shift.

36

Plaintiff does not directly address whether having him work the earlier shift would have created an undue hardship upon Defendant.  Rather, Plaintiff suggests that there were alternative means of accommodating him that were reasonable. Specifically, Plaintiff contends he could have permanently swapped shifts with his co-worker Helen Osborne; Defendant could have had Helen Osborne and Plaintiff alternate working the late and early shifts or Defendant could have inquired as to whether other employees could have switched with Plaintiff.  However, there were no other employees in this location, besides Helen Osborne, who held the same position as Plaintiff.[13]  And Canon cannot reasonably force other employees to change their shifts in order to accommodate Plaintiff.  There is no evidence on Plaintiff's behalf that he presented alternating shifts as a reasonable accommodation during his employment; that option only was floated during this litigation.  As to the option that was proposed, that is, reverting to the early shift with no one to cover the late shift, Plaintiff has failed to come forward with evidence to contradict Canon's allegation that this option would have caused undue hardship to Canon.  Consequently, this Court

---

[13] Plaintiff claims Helen Osborne agreed to switch with him on a permanent basis, Pl.'s Dep., 37:18-20, but Helen Osborne claims she only ever agreed to swap shifts with Plaintiff occasionally, when a need arose, Dep. of Helen Osborne, 32:19-24.

finds that Plaintiff cannot prevail on the first element of his NJ LAD failure-to-accommodate claim.

### ii.  Interactive Process

To prove that an employer failed to cooperate in the interactive process, the employee must show: "(1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." Tynan v. Vicinage 13 of the Superior Court of New Jersey, 798 A.2d 648, 657 (N.J. Super. Ct. App. Div. 2002).

Examples of acting in bad faith include: "failure by one of the parties to help the other party determine what specific accommodations are necessary," "obstruct[ing] or delay[ing] the interactive process" of negotiating a reasonable accommodation, and "fail[ing] to communicate, by way of initiation or response[.]"  Taylor v. Phoenixville School District, 184 F.3d 296, 312 (3d Cir. 1999).

To support its position that it engaged in an interactive process, Defendant points to the extensive discussions it held with Plaintiff and steps it took to gather information on Plaintiff's illness, such as the sleep study, which have previously been discussed.

Plaintiff argues that the sleep study was unnecessary, since he had already been diagnosed by Dr. Willingmyre. However, Plaintiff himself initially thought he suffered from sleep apnea, which the sleep study found not to be the case. Plaintiff also notes that he had to repeatedly ask Mr. Kenderdine, who worked in the Human Resources department, Mr. Remetz and Mr. Pitt about the status of his request, since no change had occurred.  Plaintiff emphasizes that Defendant never contacted Dr. Willingmyre to gather information even though Plaintiff had authorized Defendant to do so.  But Defendant already had the benefit of Dr. Willingmyre's suggestion in May 2008 to move Plaintiff to the early shift, which was not feasible at Plaintiff's job site, so it is not clear that consultation with Dr. Willingmyre would have helped the parties identify other options.  Plaintiff, of course, was himself free to supplement Dr. Willingmyre's medical note but did not do so. Regarding potential alternative jobs at Canon, Defendant told Plaintiff to search the intranet for available positions, but none existed.  Further, while Plaintiff points out that Defendant never even suggested the Lake Success position until April, 2009, there is no evidence that the Lake Success position was vacant before that time or that Defendant somehow delayed offering it. Additionally, while Plaintiff disputes that Canon officially offered the Analyst position, there is no dispute

39

that the concept of his taking the Analyst job on a regular shift at his same rate of pay was discussed, again demonstrating Defendant's participation in the interactive process that NJ LAD requires.

This Court finds that both parties engaged in a good faith interactive process.  While there was some delay, the evidence in the record demonstrates that any delays were attributable to both parties.  There is no evidence from which a reasonable jury could find that Defendant obstructed the process, failed to respond to Plaintiff's inquiries or did not try to find a reasonable accommodation for Plaintiff.

### iii. Fault for Breakdown in Interactive Process

Defendant further asserts that, to the extent that the interactive process broke down, such breakdown was the responsibility of Plaintiff alone.  In Taylor v. Phoenixville School District, the Third Circuit stated that when "an employee insists on a single accommodation that is unreasonable as a matter of law, then the employee will be at fault for the breakdown in the interactive process."  184 F.3d at 316 n.7. Plaintiff responds, in opposition, that Defendant was responsible for the breakdown in the interactive process because Defendant did not engage in the process in good faith.  As the Court has already determined, however, that no dispute of fact exists as to Defendant's good-faith participation in the

40

interactive process of identifying a reasonable accommodation, the Court concludes that no dispute of fact exists in the record demonstrating that Defendant was responsible for any breakdown in the process.

### iv.  Failure to identify the existence of a reasonable accommodation

Under the reasonable accommodation provisions of the ADA, the plaintiff has an obligation to make "a facial showing that [the] proposed accommodation is possible." Turner v. Hershey Chocolate, 440 F.3d 604, 614 (3d Cir. 2006).  Defendant implies that this same requirement must be applied to the LAD as well. Plaintiff identified three possible reasonable accommodations: (1) switching with Helen Osborne; (2) promoting Anthony Alfaro to Supervisor, Strategic Pricing and having him work the late shift out of the Lake Success office; or (3) offering Plaintiff an analyst position.  Defendant argues it had no duty to promote a third party in order to accommodate Plaintiff.  Regarding the third proposal, Plaintiff and Defendant dispute whether Defendant actually offered the Analyst position to Plaintiff. This is a factual dispute but, as explained below, the dispute is not material.

There have been a number of cases from various areas of the country in which employees, seeking a reasonable accommodation, wished to change their shift time because of commuting issues.

41

See Bull v. Coyner, 2000 WL 224807 (N.D. Ill. Feb. 23, 2000);
Salmon v. Dade County School Board, 4 F. Supp. 2d 1157 (S.D.
Fla. 1998); Schneider v. Continental Casualty Co., 1996 U.S.
Dist. LEXIS 19631 (N.D. Ill. Dec. 16, 1996).  Although these
cases involved the Americans with Disabilities Act, "because of
the dearth of New Jersey [case] law on the issue of the
employer's obligation to accommodate the physical handicap of an
employee . . . both federal and New Jersey state courts have
consistently looked to federal law for guidance in construing
the NJLAD."  LaResca v. American Telephone & Telegraph, 161 F.
Supp. 2d 323, 334 (D.N.J. 2001) (internal citations and
quotations omitted).  In all of these cases, the court found
that "[a]n employer is required to provide reasonable
accommodations that eliminate barriers in the work environment,
not ones that eliminate barriers outside the work environment,"
and commuting is a barrier that falls outside the work
environment.  LaResca 161 F. Supp. 2d at 334 (citing Schneider
at *24-*25).  LaResca, which involved the LAD, found the same.
161 F. Supp. 2d at 335.

While neither party raises any comparison to these
commuting cases, the connection seems appropriate.  Plaintiff
claims that his migraines are a symptom of his insomnia and his
insomnia stems from his having to work the late shift.  Pl.'s
Dep., 109:7-8.  Plaintiff's shift impacts Plaintiff's ability to

sleep, but sleeping is not part of his job. See Laresca, 161 F. Supp. 2d at 335 (describing a separate case, Seiden v. Marina Assocs., 315 N.J. Super. 451 (1998), in which "the plaintiff's shift assignment affected the plaintiff's ability to stand, which was part of his job requirement."). Therefore, the Court concludes that all accommodations identified by Plaintiff were not reasonable accommodations, as they required accommodations for Plaintiff's life outside the requirements of his job. There is therefore no evidence from which a reasonable jury could find that Plaintiff satisfactorily proposed a reasonable accommodation at the time of his employment discussions. Consequently, the Court finds that Plaintiff has failed to identify a reasonable accommodation.

Due to Plaintiff's failures of proof on the necessary prongs of his LAD of failure to accommodate (namely, undue hardship, interactive process and failure to identify the existence of a reasonable accommodation), summary judgment for Defendant will be granted upon Plaintiff's LAD failure-to-accommodate claim.

### 2. LAD Retaliation

To prove a retaliation claim under the LAD, the plaintiff must show: "(1) plaintiff was in a protected class; (2) plaintiff engaged in protected activity known to the employer; (3) plaintiff was thereafter subjected to an adverse employment

consequence; and (4) that there is a causal link between the protected activity and the adverse employment consequence." Victor v. State, 4 A.3d 126, 141 (N.J. Sup. Ct. 2010). Defendant and Plaintiff both cite to older cases, which omit the first requirement for setting out a prima facie case.

After the plaintiff sets out a prima facie case for retaliation, the defendant has the opportunity to provide a legitimate, non-retaliatory reason for the adverse employment action. Carmona v. Resorts Int'l Hotel Inc., 189 N.J. 354, 366 (N.J. Sup. Ct. 2007). Once the defendant has provided a non-retaliatory reason, the plaintiff "must show that more likely than not it was retaliation that motivated the employer's action." Id. This can be accomplished by "proving that [Defendant's] stated reason was a pretext for retaliation or that retaliation for making a complaint of discrimination was more likely the reason that motivated the employer." Id.

### i. Prima Facie Case

Plaintiff has set out a prima facie case for LAD retaliation. First, there is evidence from which a jury could find that he is handicapped within the meaning of LAD. See discussion supra, Part (IV)(B)(1). Second, there is evidence that Plaintiff engaged in activity protected by LAD by at least attempting to obtain a reasonable accommodation and taking leave related to his LAD handicap. Third, there is evidence that he

44

suffered an adverse employment action when he was fired.
Fourth, Plaintiff offers plausible evidence of causation on two
grounds: temporal proximity and ongoing antagonism due to his
handicap.  Plaintiff was terminated on April 27, only six days
after requesting FMLA leave.[14]  Plaintiff contends Mr. Pitt's
negative comments about Plaintiff's absences and the negative
feedback on his performance reviews related to his absenteeism
also prove the causation element for LAD, and a jury could
reasonably agree.  See discussion supra, Part (IV)(A)(1)(ii).

     Plaintiff has therefore set out a prime facie case for LAD
retaliation.  A reasonable jury could find causation at least
based on the timing of Plaintiff's termination, even if it found
Joseph Pitt's remarks not to constitute discouragement.  A lot
happened in Plaintiff's final week of employment, including the
Lake Success transfer offer, Plaintiff's absence from April 20
to April 23, allegedly due to migraines, Defendant's discovery
of Plaintiff's e-mail misrepresenting his doctor's visit excuse
and his apparent submission of the April 24th note from Dr.

---

[14]  By incorporating his FMLA causation and pretext arguments
into his LAD arguments, see Pl.'s Mem. of Law in Opp'n to Def.'s
Mot. for Summ. J. 39 n.11, Plaintiff assumes that his
potentially FMLA-qualifying absences would also be LAD-
qualifying.  This seems like a reasonable assumption in
Plaintiff's favor, as the party opposing summary judgment,
because his NJ LAD disability encompasses a broader range of
conditions than his FMLA "serious health condition."  In this
case, a condition serious enough to trigger FMLA would, a
fortiori, be substantial enough to satisfy NJ LAD's definition.

Deborah Horowitz seeking to excuse his absences due to migraines and sinusitis, which it will be up to a jury to sort out, as now discussed.

### ii.   Defendant's Legitimate Business Reasons for Terminating Plaintiff

Assuming Plaintiff has established his prima face case, Defendant alleges three legitimate business reasons for terminating Andrew Rosenfeld's employment: (1) his work performance was subpar, as indicated by his yearly performance reviews; (2) he exceeded his allotted sick days in each year of his employment; and (3) he falsified company records by writing to Joseph Pitt that he had seen a doctor when he had either seen his mother, a nurse practitioner, or no one.

### iii. Pretext

To demonstrate that a defendant's proffered, legitimate reasons for an adverse employment decision are in fact pretext, Plaintiff must do more than show that his termination was "wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).  The plaintiff must demonstrate that the reasons given by defendant "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

46

legitimate reasons for its action that a reasonable factfinder
could rationally find them unworthy of credence.  Id. (internal
citations and quotations omitted) (emphasis original).

Regarding his alleged poor performance, Plaintiff notes
that he never received written or verbal discipline, that some
aspects of his work received praise and that many company
documents do not mention performance as a reason for terminating
Plaintiff.  And, Defendant did not list poor performance as a
reason for terminating Plaintiff in its separation paperwork.
Pl.'s Mot. for Summ. J., Ex. V.

Regarding the "falsified documents" charge, Defendant
claims that Plaintiff sent an e-mail on April 13, 2009, to his
boss, Joseph Pitt, in which he stated he had visited a doctor
for a sinus infection, when in fact, Plaintiff later changed his
story to indicate that he had actually seen his mother, a nurse
practitioner. His mother, when deposed, failed to confirm even
this version of his story.  Plaintiff points out that Defendant
refused to identify the allegedly falsified documents to
Plaintiff during the termination meeting, despite Plaintiff's
inquiries.  There appears to be no dispute, however, that the
falsified document is Plaintiff's false e-mail to Joseph Pitt
about his doctor visit and instruction to stay home; that it was
also described incorrectly as a text message is not a material
factual dispute.  In mitigation, according to Plaintiff's

47

testimony, after he had sent the falsified e-mail to Joseph
Pitt, Plaintiff spoke with Robin Rutter and told her that he had
seen his mother instead.  Pl.'s Dep, 338:10-16.  However, he did
not indicate that he had made a mistake in his e-mail to Joseph
Pitt.  Id. at 339:3-10.

A jury may well conclude that Defendant's reasons for
terminating Plaintiff had nothing to do with his medical
condition, and everything to do with his lie and his poor
performance on the job.  On the other hand, though a jury need
not conclude Defendant's stated reasons for terminating
Plaintiff were pretextual, there is sufficient evidence for a
jury to so conclude.  See discussion supra, Part IV.A(2)(ii).
There are genuine issues of material fact that must be left for
a jury to resolve at trial; Defendant's motion for summary
judgment upon Plaintiff's LAD retaliation claim must therefore
be denied.

### 3.   LAD Discrimination on the basis of an actual or perceived handicap

To prove a prima facie case for discriminatory discharge
under the LAD, Plaintiff must show: "(1) that [he] was
handicapped, (2) that [he] was otherwise qualified to perform
the essential functions of the job, with or without the
accommodation by the employer, and was performing at a level
that met the employer's expectations, (3) that [he] nevertheless

48

was fired, and (4) that the employer sought someone to perform the same work after [he] left." Dicino v. Aetna U.S. Healthcare, Civ. No. 01-3206, 2003 WL 21501818, at *12 (D.N.J. June 23, 2003).  "The fourth element is needed to allow an inference to be drawn of disparate treatment, since if the disabled employee's job was given to a nondisabled person it could be inferred that the disabled employee received the adverse job action because of his or her disability." Seiden, 315 N.J. Super. at 459.

Defendant contends Plaintiff has not established a prima facie case because Plaintiff (1) was not handicapped within the meaning of the LAD, (2) Plaintiff did not meet Canon's expectations in his job performance and (3) Plaintiff cannot show a causal connection between his termination and handicap.[15]

### i.   LAD Definition of handicap

Plaintiff has presented medical evidence from which a reasonable jury may find he was handicapped within the meaning of the LAD.  See discussion supra, Part IV.B(1).

---

[15] While Plaintiff must demonstrate that he is handicapped within the meaning of the LAD and that he can otherwise perform his job, Plaintiff does not need to show causation to establish a prima facie case.  Defendant cites to Jansen v. Food Circus Supermarkets, Inc., 110 N.J. 363, 382-83 (1988) for the proposition that causation is an element of a prime facie handicap discrimination case.  But Jansen does not say this. Jansen states the fourth prong as: "that the [employer] sought someone to perform the same work after [the handicapped employee] left." 110 N.J. at 382.

### ii.   Otherwise able to perform essential job functions

At least in the ADA context, whether a job function qualifies as essential "is a factual determination that must be made on a case by case basis [based upon] all relevant evidence."  Conneen v. MBNA Bank N.A., 334 F.3d 318, 326 (3d Cir. 2003) (emphasis in original) (internal citations and quotations omitted).

Defendant's main contention is that because Plaintiff could not work the 11:30 to 8:00 shift, he failed to perform a basic function of his job description.  Defendant also emphasizes Plaintiff's 2007 and 2008 performance reviews, which note a substantial number of areas in which Plaintiff needed to improve, all as evidence that Plaintiff was not performing at a level that met the employer's expectations.

As to the second aspect of his qualifications, his performance reviews, Plaintiff contends that his evaluations could be construed as satisfactory, and notes that he received raises and that he never received written or verbal discipline regarding his performance. Plaintiff also mentions "a legal dispute regarding the nature of the second element of a NJ LAD disability/perceived disability claim."  Pl.'s Mem. Of Law in Opp'n to Def.'s Mot. for Summ. J. n.8.  But Plaintiff does not indicate what that legal dispute is.

As to Defendant's main argument on this element, however, the Court finds that Plaintiff has not demonstrated at least a dispute of fact on this element to survive summary judgment. While there is a clear dispute as to whether Plaintiff could perform the essential job functions during the time he was present, it appears there is no dispute that Plaintiff could not perform the essential job function of working the late shift. On the basis of the record, the Court concludes that Plaintiff's start and end times constitute an essential job function. Unless Plaintiff was present until 8:00 p.m. each evening, there would be no late shift supervisor to meet the company's central and west coast needs on the later part of business days.  Those needs indisputably included making quick decisions about pricing in transactions that could not be delayed to the next business day.

In this case, one of the primary functions of Plaintiff's job was to support the central and west coast operations. Plaintiff was made aware of this fact at the outset and agreed to it.  As previously discussed, Plaintiff's job duties were time sensitive.  When a Request for Proposal came into the office, it was often important to respond quickly.  Given that Canon had centralized its strategic pricing operations on the east coast, the only way to respond promptly to RFPs that came in late in the day on the west coast, was to have someone work

later on the east coast.  If Plaintiff's contention that he was unable to work past 5:00 p.m. due to his conditions is true, then it is also true he was unable to perform an essential job function for which he was hired.  The Court therefore finds that Plaintiff has not met his burden of pointing to a dispute of fact that he was otherwise qualified to perform the essential duties of his job with or without an accommodation.  The Court therefore concludes that summary judgment is warranted as to Plaintiff's NJ LAD discriminatory termination claim.

### C. Punitive Damages

Plaintiff seeks punitive as well as actual and compensatory damages.  Compl.  ¶¶ C, D.  Defendant maintains Plaintiff cannot seek punitive damages.  Under the FMLA, courts cannot award punitive damages.  See 29 U.S.C. § 2617(a)(1)(A); Zawadowicz v. CVS Corp., 99 F. Supp. 2d 518, 540 (D.N.J. 2000).

Under NJ LAD, punitive damage awards are expressly permitted.  N.J.S.A 10:5-3.  To award punitive damages under the LAD, two conditions must be met: "First, punitive damages can only be assessed against an employer if there was actual participation by upper management or willful indifference," and "[s]econd, a plaintiff must also set forth proof that the offending conduct [is] especially egregious."  Hurley v. Atlantic City Police Dept., 174 F.3d 95, 124 (3d Cir.) (emphasis in original) (internal citations and quotations omitted).

52

The New Jersey Supreme Court has previously expounded on what behavior qualifies as "particularly egregious."  It stated: "To warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious.  There must be an intentional wrongdoing in the sense of an 'evil-minded act' or an act accompanied by a wanton and willful disregard of the rights of another."  Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 49 (1984).  The Supreme Court of New Jersey has further explained the meaning of willfulness and wantonness: "the requirement [of willfulness or wantonness] may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences."  Rendine v. Pantzer, 141 N.J. 292, 314 (1995) (internal citations and quotations omitted).  Further, "[e]ven though New Jersey has a strong public policy against discrimination . . ., punitive damages are not automatically available simply on the basis of a LAD violation. Instead, a plaintiff must still show exceptional or outrageous action to recover such damages."  Maiorino v. Schering-Plough Corp., 302 N.J. Super. 323, 353 (N.J. Super. Ct. App. Div. 1997).

Plaintiff has satisfied the first requirement, since upper management participated in the decision to terminate Plaintiff. Even if Defendant violated the LAD, there is little on the

53

record to indicate that Defendant's behavior was "wantonly reckless" or egregious.  The evidence indicates that Defendant engaged in a genuine interactive process to accommodate Plaintiff's disability.  He was never disparaged or ridiculed for his condition; at most, his boss would seem impatient with him when he called out sick.  Canon seemed willing to transfer him to an available Analyst position on the early shift at the same salary, but Plaintiff was not interested.  Defendant offered the same supervisory position at its Long Island office but Plaintiff did not want to move.  This is not the stuff of wanton or willful conduct by Canon or its management, and upon all the circumstances, no reasonable jury could find that Plaintiff's evidence meets the standard for punitive damages under the NJ LAD.

Defendant's motion for summary judgment dismissing all punitive damages claims under FMLA and NJ LAD will be granted.

**V.  CONCLUSION**

For the reasons stated above, the Court will deny Plaintiff's motion for summary judgment in its entirety, and deny in part and grant in part Defendant's motion for summary judgment as to all of Plaintiff's claims.

Specifically, with regard to Plaintiff's FMLA interference claims, the Court will grant Defendant's motion for summary

54

judgment as to any FMLA claims premised on Plaintiff's alleged sleep apnea or migraines, as these alleged conditions do not meet the definition of chronic serious health condition. Additionally, the Court will grant summary judgment against Plaintiff's claims of FMLA interference with regard to his insomnia for any act taken prior to May of 2008, because Plaintiff has not pointed to a dispute of fact establishing notice to Defendant prior to that date.  However, the Court will deny both Parties' motions with regard to FMLA interference for post-May, 2008, actions with regard to Plaintiff's insomnia, the Court having concluded that disputes of fact exist regarding whether Defendant interfered with Plaintiff's FMLA leave for that condition in that time period.

As to Plaintiff's claim of FMLA retaliation, the Court will deny Defendant's motion for summary judgment because the Court has determined that Defendant did not meet its burden of pointing to undisputed evidence in the record establishing by a preponderance of the evidence that Defendant would have terminated Plaintiff regardless of FMLA-qualified absences.

As to Plaintiff's NJ LAD claims, the Court will grant Defendant's motion for summary judgment as to Plaintiff's failure-to-accommodate claim and discriminatory termination claim, but will deny Defendant's motion for summary judgment with regard to Plaintiff's NJ LAD retaliation claim.

55

Additionally, the Court will grant Defendant's motion for summary judgment as to Plaintiff's claims for punitive damages through either the FMLA or the NJ LAD.

The accompanying Order will be entered.


**September 26, 2011**                    **_s/ Jerome B. Simandle  _**
Date                                      JEROME B. SIMANDLE
                                          United States District Judge

56